IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN BURNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv- |
| | ) | |
| FORD MOTOR COMPANY, a Delaware Corporation, | ) | Judge |
| | ) | |
| | ) | Magistrate Judge |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## *COMPLAINT AT LAW*

NOW COMES the Plaintiff, KEVIN BURNETT, by and through his attorney, WALSH LAW GROUP, P.C., and presents his Complaint at Law and in support thereof, complains as follows:

## *NATURE OF THE ACTION*

1. This is an action under Title I of the Americans with Disabilities Act ("the ADA") to correct unlawful employment practices on the basis of disability and to provide appropriate relief to Kevin Burnett (hereinafter "Mr. Burnett"), who was subjected to discrimination and retaliation based upon his disability and/or perceived disability and for exercising the rights enumerated above by his employer, Ford Motor Company (hereinafter "Ford").

## *PARTIES TO THE ACTION*

2. Prior to March 13, 2015, Mr. Burnett was an employee of Ford as defined and codified in 42 U.S.C. § 12111(4).

1

3. At all relevant times, Mr. Burnett was a "qualified individual" as defined and codified in 42 U.S.C. § 12111(8).

4. At all relevant times, Ford was an "employer" as defined and codified in 42 U.S.C. § 12111(5), headquartered in Dearborn, Michigan.

5. At all relevant times, Ford was regularly doing business within the State of Illinois, County of Cook, including but not limited to, maintaining an assembly plant at 12600 South Torrence Avenue in Chicago.

## *JURISDICTION AND VENUE*

6. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331. This action is authorized and instituted pursuant to Title I of the ADA, codified at 42 U.S.C. § 12101, *et seq.*

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(1)(2) and (3), in that Mr. Burnett resides in this district, Ford regularly does business and may be found in this district and all of the events occurred in this district.

8. All conditions precedent to the institution of this lawsuit have been fulfilled, including receipt of a right-to-sue letter issued by the Equal Employment Opportunity Commission and received by Mr. Burnett on or near January 25, 2016. *See* Exhibit A.

## *STATEMENT OF FACTS*

9. Prior to May 19, 2014, Mr. Burnett applied to be either a supervisor or engineer with Ford at its Chicago assembly plant located at 12600 South Torrence Avenue. Neither the supervisor nor engineer positions required heavy lifting or standing for long periods.

10. Before Mr. Burnett was hired, he notified Ford that he had arthritic knees that might limit his ability to perform certain activities.

11. Mr. Burnett was hired by Ford on May 19, 2014. After Ford hired Mr. Burnett, he was assigned to a position on an assembly line in the "body department" lifting steel onto a conveyor belt, rather than as a supervisor or engineer. 2-3 months. Asked to be transferred.

12. Mr. Burnett was unable to perform the lifting required in the body department due to his arthritic knees, so he was transferred to the instrument panel section of the "trim department."

13. For the next six months Mr. Burnett installed the instrument panels in cars. He was able to perform all functions of the job despite his arthritic knees because each car on the assembly line stopped at his station during the time he needed to complete the work.

14. After six months in the instrument panel section of the trim department, Mr. Burnett was transferred to another section of the trim department called the "A-Line," where the cars do not stop. In this position, Mr. Burnett had to bend, crouch and walk with each vehicle as he worked.

15. On Thursday, March 8, 2015, after approximately 50 days of working on the A-Line, Mr. Burnett's knees gave out and he was taken by ambulance to the medical department. He was then taken to his doctor's office.

16. On March 11, 2015, Mr. Burnett returned to the A-Line and worked for two hours, but was really struggling.

17. Shortly thereafter, a nurse from Ford gave Mr. Burnett a medical release to submit to his physician and sent him home.

18. On March 12, 2015, Mr. Burnett saw his personal physician, Dr. Rueben Nichols. Dr. Nichols completed a return to work form, which opined that Mr. Burnett could return to work with the reasonable accommodation of mainly seated work.

3

19. Mr. Burnett returned to Ford immediately after leaving Dr. Nichol's office and provided the note to his supervisor, Kathy Parker.

20. At the same time, Mr. Burnett also asked Ms. Parker to be assigned to a position consisting of mainly seated work as a reasonable accommodation, including inspecting grommets or installing the instrument panels. Ms. Parker told Mr. Burnett to sit down and 45 minutes later told him he had to go home.

21. March 13, 2015 was Mr. Burnett's next scheduled work day and he arrived at 6:00 a.m., as scheduled. At 6:45 a.m., Ms. Parker told Mr. Burnett there was no work available, put him on "no work available" status and sent him home.

22. To the contrary, at all times complained of, there were numerous positions available at Ford's assembly plant at 12600 South Torrence Avenue in Chicago that only required seated work or very little standing. Those positions included inspection positions, computer operation positions and others.

23. Ford understood that Mr. Burnett was a qualified individual but refused to provide him with a reasonable accommodation so that he could continue to work.

24. Between March 13, 2015 and the present, Mr. Burnett has not received any calls to work or been provided with any work or income from Ford. He was, therefore, in addition to being denied work, effectively discharged.

25. At no time did anyone at Ford attempt to engage in the interactive process or otherwise discuss a reasonable accommodation for Mr. Burnett's disability.

26. Mr. Burnett's discharge was due to his disability and in retaliation for asking for a reasonable accommodation.

4

## COUNT I - VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT - FAILURE TO ACCOMODATE

27. Mr. Burnett repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through twenty-six as if fully set forth herein.

28. According to the ADA, an employer must respond expeditiously to an employee's request for a reasonable accommodation.

29. Ford received Mr. Burnett's request for a reasonable accommodation no later than March 12, 2015.

30. Rather than respond expeditiously to Mr. Burnett's March 12, 2015 request for a reasonable accommodation, Ford improperly and vexatiously refused to respond to Mr. Burnett's request so he would be forced to go on permanent leave.

31. No representative from Ford met with Mr. Burnett to discuss his disability or his request for a reasonable accommodation.

32. Ford never intended to offer Mr. Burnett a reasonable accommodation and in fact never did offer him a reasonable accommodation although several were available.

33. Mr. Burnett was able to perform all the essential functions of numerous open and available positions at the assembly plant at 12600 South Torrence in Chicago with or without a reasonable accommodation.

34. As a result of the aforementioned discriminatory acts of Ford, Mr. Burnett suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, KEVIN BURNETT demands judgment against FORD MOTOR COMPANY in an amount in excess of $300,000.00, and for all legal and equitable relief available

pursuant to Title I of the Americans with Disabilities Act, plus attorneys' fees, punitive damages, litigation expenses and cost of suit.

### COUNT II – VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT – RETALIATION

35. Mr. Burnett repeats, re-alleges and incorporates by reference the factual allegations of paragraphs one through twenty-six as if fully set forth herein.

36. Between the date of Mr. Burnett's application with Ford and the present, Ford knew Mr. Burnett was disabled as defined in the ADA or Ford perceived him to be disabled within the meaning of the ADA.

37. Mr. Burnett engaged in a protected activity when he notified Ford that he was disabled and on March 12, 2015 when he requested a reasonable accommodation.

38. Following Mr. Burnett's March 12, 2015 request for a reasonable accommodation, Ford determined it would no longer provide Mr. Burnett with employment.

39. Prior to March 13, 2015, Ford was aware that Mr. Burnett had provided notification of his disability and requested an accommodation.

40. On March 13, 2015, the day after Mr. Burnett and Dr. Nichols requested a reasonable accommodation and in retaliation for requesting a reasonable accommodation, Ford stopped providing Mr. Burnett with employment opportunities.

41. As a result Ford's aforementioned retaliatory acts, Mr. Burnett has suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, MR. BURNETT demands judgment against FORD MOTOR COMPANY in an amount in excess of $300,000.00, and for all legal and equitable relief available pursuant to

Title I of the Americans with Disabilities Act, plus attorneys' fees, litigation expenses and cost of suit.

### COUNT III – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – CONSTRUCTIVE DISCHARGE

42. Mr. Burnett repeats, realleges and incorporates by reference the factual allegations of paragraphs one through twenty-six as if fully set forth herein.

43. Ford stopped providing Mr. Burnett with any work or income for over a year after Ms. Parker sent him home on March 13, 2015.

44. The failure to provide Mr. Burnett with any work or income was a change in terms and conditions of employment that was sufficiently severe and pervasive to render further employment at Ford impossible.

45. Mr. Burnett was effectively terminated from employment by Ford because of the lack of work or income for over a year.

WHEREFORE, MR. BURNETT demands judgment against FORD MOTOR COMPANY in an amount in excess of $300,000.00, and for all legal and equitable relief available pursuant to Title I of the Americans with Disabilities Act, plus attorneys' fees, punitive damages, litigation expenses and cost of suit.

### COUNT IV – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS

46. Mr. Burnett repeats, realleges and incorporates by reference the factual allegations of paragraphs one through twenty-six as if fully set forth herein.

47. Mr. Burnett's arthritic knees and consequent limitations were known to Ford throughout Mr. Burnett's employment.

48. Mr. Burnett requested that Ford make a reasonable accommodation for his limitation/condition so that he would be able to perform a job that did not require excessive lifting and standing.

49. Mr. Burnett was willing to participate in an interactive process to determine whether a reasonable accommodation could be made so that he would be able to perform all the essential job requirements of a position at Ford.

50. Ford failed to participate in a timely good-faith interactive process to determine whether reasonable accommodation could be made.

51. Ford's failure to engage in a good-faith interactive process was a substantial factor in Mr. Burnett being denied further employment at Ford.

### *JURY DEMAND*

52. Mr. Burnett demands trial by jury pursuant to the Title I of the Americans with Disabilities Act.

Respectfully submitted,

WALSH LAW GROUP, P.C.


By: ___/s/ Patrick J. Walsh____
      Patrick J. Walsh, Esq.


Patrick J. Walsh, Esq.
WALSH LAW GROUP, P.C.
30 South Wacker Drive, Suite 2200
Chicago, Illinois 60606
(312) 466-7683
ARDC. No. 6287629
pw@thewalshlawgroup.com